**STATE of Iowa, Appellee,**

v.

**William Henry VINCIK, Appellant.**

No. 88–182.

Supreme Court of Iowa.

Feb. 22, 1989.
As Corrected May 11, 1989.

Leon F. Spies of Mellon & Spies, Iowa City, for appellant.

Thomas J. Miller, Atty. Gen., Christie J. Scase, Asst. Atty. Gen., Denver D. Dillard, County Atty., and Harold L. Denton, Asst. County Atty., for appellee.

Considered by HARRIS, P.J., and LAVORATO, NEUMAN, SNELL, and ANDREASEN, JJ.

SNELL, Justice.

Defendant, William Henry Vincik, appeals his conviction of second-degree murder in the killing of his wife, Inez, in violation of Iowa Code sections 707.1 and 707.3 (1983). He contends (1) physical evidence found by police during a warrantless search of his home should have been suppressed at trial, and (2) the evidence introduced at trial was insufficient to support his conviction. We reversed Vincik's previous conviction on this charge in *State v. Vincik*, 398 N.W.2d 788 (Iowa 1987), after finding a confession obtained from him had been involuntarily given. We declined to address the search and seizure question now raised because the trial court had not addressed the question of consent and, in any event, the case was to be remanded for a new trial. *Id.* at 794. We affirm.

The factual background of the challenged search and seizures is not disputed. At 12:03 p.m. on June 26, 1984, the Cedar Rapids Police Department received a "911" call from a person who identified himself as Bill Vincik and reported he had been shot. An ambulance and police were immediately dispatched to Vincik's residence. At 12:05 p.m., Officers Thomas and Decker arrived at the home. They rang the doorbell and knocked on the door, but received no response. They then discovered the front door was unlocked, and proceeded to enter the house. They observed blood

spots on the floor several feet from the front door, but saw no one in the kitchen or living room. They then went down the hallway leading to a bathroom and two bedrooms. In the master bedroom, they discovered a male and a female, Vincik and Inez, lying motionless on the bed amid a large quantity of blood. Both had been shot in the head.

While Officer Thomas checked the half-bath just off the bedroom, Officer Decker went downstairs to check the basement for any more shooting victims or subjects in the house, and was joined by Officer Davisson, who had just arrived. They found no one in their search of the basement and did not observe anything of evidentiary value. Officer Davisson then went outside to secure the scene; Officer Decker again checked the kitchen and observed blood on the faucets of the sink and on a plastic cup sitting on the counter beside the sink.

After Officer Thomas completed his search of the half-bath, he noticed Vincik was moving slightly on the bed and that his chest was rising and falling. The ambulance attendants, who had just arrived, were therefore allowed into the house to care for him. Officer Thomas then re-checked the upstairs, observing the blood in the kitchen, and checked the basement to ensure the other officers had not missed someone in their search. After this check, he considered the house secure.

Approximately twenty minutes later, at 12:30 p.m., Identification Officer Hagist arrived. By this time, a number of officers and detectives had already arrived. They had checked the interior of the home for additional victims or subjects at least one more time, and had secured the exterior of the home with crime scene tape. Many of them observed the blood spatters by the front door, and in the kitchen and the master bedroom. Also observed was a bullet hole in the wall of the master bedroom.

Officer Hagist began to photograph the scene and to look around for the possible murder weapon. Vincik had already been transported from the house by the ambulance attendants, but Inez's body had not been moved. Standing next to the bed, Officer Hagist observed two .45 caliber shell casings on the floor between the bed and the nightstand; peering under the bed, he observed a third .45 shell casing. All of these were photographed, as was the bullet hole in the wall that the head of the bed was against. This hole was located to the right of the bed just below eye-level.

Another bullet hole was discovered in the pillow underneath Inez's head by the medical examiner, who arrived shortly after Officer Hagist. When he did not find a corresponding opening on the other side of the pillow case, the medical examiner dug into the pillow and discovered a .45 slug. Officer Hagist later broke a hole near the baseboard in the bedroom wall and extracted another .45 slug. A third slug was recovered from the back of Inez's head during the autopsy of her body.

During a search of the bed before Inez's body was moved, Officer Hagist discovered a .45 semi-automatic pistol beneath the sheets, approximately in the middle of the bed. He had felt the presence of a heavy object in the sheets when sliding them off the bed in the course of his search for the gun. Further examination of the sheets revealed the gun, which was wrapped in a blue t-shirt, near Inez's feet.

In an earlier, general search of the bedroom for the gun, the officers also discovered a holster and .45 ammunition in a closed dresser drawer. These items were not introduced at trial by the State; rather, a police photograph of them sitting in the opened drawer was introduced by Vincik.

Officer Hagist also visited the other areas of the house. In an office area in the basement, he observed on the desk a gun-box for a .45 pistol. He seized the box and later photographed the area on the desk from which it had been obtained. The other areas of the house were also photographed.

I. *Motion to Suppress.* Before trial, Vincik moved to suppress all of the items seized from his home as well as evidence of any examinations, tests, or analyses of those items. The district court overruled this motion, allowing the State to introduce all the physical evidence which had not

already been suppressed by a previous order. The challenged evidence ultimately introduced by the State, and allowed by the court, included the t-shirt, the gun, the gunbox, two .45 slugs (the admissibility of the slug recovered from Inez's head was not challenged), three .45 shell casings, and ballistics tests showing that the slugs and shell casings had been fired from the gun.

■ Because Vincik alleges he was deprived of a constitutional right, our review of the district court's suppression ruling is de novo, which permits an independent evaluation of the totality of the circumstances as shown by the entire record, *State v. Schubert*, 346 N.W.2d 30, 32 (Iowa 1984); *State v. Hatter*, 342 N.W.2d 851, 854 (Iowa 1983), including the evidence introduced at trial as well as that adduced at the hearing on the motion. *Schubert*, 346 N.W.2d at 33; *State v. Donnell*, 239 N.W. 2d 575, 577–78 (Iowa 1976).

■ The law in this area is well-settled. Warrantless searches and seizures are unreasonable unless they fall within one of the carefully drawn exceptions to the warrant requirement. *State v. Emerson*, 375 N.W.2d 256, 258 (Iowa 1985). These exceptions include consent to a search, probable cause coupled with exigent circumstances, or plain view. *Id.; State v. Lamp*, 322 N.W.2d 48, 53 (Iowa 1982). There does not exist a "murder scene exception" that would allow the warrantless search of a home simply because a homicide had recently occurred there. *Thompson v. Louisiana*, 469 U.S. 17, 21, 105 S.Ct. 409, 411, 83 L.Ed.2d 246, 251 (1984) (quoting *Mincey v. Arizona*, 437 U.S. 385, 395, 98 S.Ct. 2408, 2414, 57 L.Ed.2d 290, 302 (1978)).

However, as stated by the United States Supreme Court:

We do not question the right of the police to respond to emergency situations. Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid. Similarly, when the police come upon the scene of a homicide they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises. The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency. And the police may seize any evidence that is in plain view during the course of their legitimate emergency activities.

*Mincey*, 437 U.S. at 392–93, 98 S.Ct. at 2413, 57 L.Ed.2d at 300 (citations omitted).

■ In this case, Vincik's "911" call, in which he requested help and indicated he had been shot, clearly justified the warrantless entries and victim/suspect searches of Officers Thomas, Decker, and Davisson. We also conclude, contrary to Vincik's contention, that the further presence of police in the house after it had been secured was merely a continuation of these initial, lawful entries, in light of the discovery of Inez's body and Vincik. *See, e.g., State v. Johnson*, 413 A.2d 931, 933–32 (Me.1980); *State v. Anderson*, 42 Or.App. 29, 35–38, 599 P.2d 1225, 1229–30 (1979), *cert. denied*, 446 U.S. 920, 100 S.Ct. 1857, 64 L.Ed.2d 275 (1980); *State v. Martin*, 274 N.W.2d 893, 897 (S.D.), *cert. denied*, 444 U.S. 883, 100 S.Ct. 173, 62 L.Ed.2d 112 (1978). Cf. *Michigan v. Tyler*, 436 U.S. 499, 509–11, 98 S.Ct. 1942, 1950–51, 56 L.Ed.2d 486, 498–99 (1978) (re-entry of firefighters into building four hours after fire was extinguished and they had departed was "no more than an actual continuation of the first" entry).

■ This is not to say the officers could make a warrantless search for evidence; they could not. They could and did make warrantless searches for other victims or subjects in the house. But once the house was secured, the warrantless searches should have stopped, since such searches must be strictly circumscribed by the exigencies which justify their initiation. *Mincey*, 437 U.S. at 393, 98 S.Ct. at 2413, 57 L.Ed.2d at 300.

■ However, because the officers' presence in the house was lawful, the plain

view doctrine was applicable. *See State v. Holland,* 389 N.W.2d 375, 381 (Iowa 1986). Evidence may be seized under the plain view doctrine if the intrusion into an otherwise protected area is justified, the discovery of the object is inadvertent, and the object's incriminating nature is immediately apparent. *Emerson,* 375 N.W.2d at 259; *State v. Oliver,* 341 N.W.2d 744, 746 (Iowa 1983).

■ Applying these principles to the challenged evidence in this case, we conclude the three .45 shell casings and the gunbox were properly seized and admitted into evidence. They were viewed by Officer Hagist while he was in a place where he had a right to be. The discovery of these items was inadvertent, as Officer Hagist did not know in advance their location and intend to seize them using the plain view doctrine as a pretext. *Oliver,* 341 N.W.2d at 746. And their incriminating nature was, without question, immediately apparent.

■ The district court also correctly admitted the gun and the t-shirt that was wrapped around it. Although they were not in plain view and were therefore improperly seized, we are convinced the record clearly demonstrates they would inevitably have been discovered during the removal of Inez's body from the bed. When the State can establish by a preponderance of the evidence that a specific piece of evidence ultimately or inevitably would have been discovered by lawful means, the exclusionary rule does not apply and the evidence should be admitted. *Nix v. Williams,* 467 U.S. 431, 444, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377, 387 (1984). It does not matter that the district court did not rely on this ground when admitting the gun and t-shirt, for its ruling will be upheld if sustainable on any grounds appearing in the record. *State v. Jespersen,* 360 N.W.2d 804, 806 (Iowa 1985); *State v. McCowen,* 297 N.W.2d 226, 227 (Iowa 1980).

■ We do not address the admissibility of the holster and .45 ammunition. This evidence was not introduced by the State. If the district court erred by failing to order these items excluded, such error was waived by Vincik's introduction of the photograph showing them in the bedroom dresser drawer. *State v. Washington,* 257 N.W.2d 890, 893 (Iowa 1977), *cert. denied,* 435 U.S. 1008, 98 S.Ct. 1881, 56 L.Ed.2d 390 (1978).

■ Admission of the slug recovered from the wall, the slug recovered from the pillow, and the results of ballistics tests performed on these slugs was perhaps erroneous. These items were not in plain view, nor can we say a preponderance of the evidence in the record establishes they would have been inevitably discovered by lawful means.

We do not, however, believe this error, if any, demands a reversal. As noted in *State v. Freeman,* 297 N.W.2d 363, 367 (Iowa 1980) (citations omitted):

> Not every error, even one of constitutional proportions, justifies a new trial or other relief. A defendant is entitled to a fair trial but not necessarily a perfect one. To deny defendant a new trial we must say the error was harmless beyond a reasonable doubt.

In this case, as in *Freeman* and cases cited therein, the challenged evidence was only cumulative to identical evidence properly in the record. We have already held the three .45 shell casings and the ballistics tests tying them to the gun found on the bed were properly admitted. And there is no dispute the slug recovered from Inez's head and the ballistics tests tying it to the gun were properly admitted. Under these circumstances, the introduction of two more slugs, also tied to the gun, would add little, if anything, to the State's case. We conclude beyond a reasonable doubt the exclusion of this evidence would not have changed the result at trial.

II. *Sufficiency of Evidence.* Vincik also contends the evidence introduced at trial was insufficient to support his conviction. The principles governing our review of this claim are as follows:

> When a criminal defendant challenges the sufficiency of evidence to support a conviction, we review all of the evidence in the record in a light most favorable to

the State. The jury's verdict is binding on us if supported by substantial evidence, together with all legitimate inferences arising reasonably and fairly from the evidence. Substantial evidence is evidence that could convince a rational trier of fact that the defendant is guilty of the charged crime beyond a reasonable doubt.

*State v. Jordan,* 409 N.W.2d 184, 184–85 (Iowa 1987); *see also State v. LaPointe,* 418 N.W.2d 49, 51 (Iowa 1988).

 The evidence properly in the record is more than ample to support Vincik's conviction. Inez sustained two gunshot wounds to the head from slugs fired from a distance of six inches to two feet. One slug passed through her head, leaving an exit wound on the back of her neck. The medical examiner later observed a bullet hole in the pillow beneath her head. The other slug was recovered from her head and was determined to have been fired from the gun found on the bed. The two .45 shell casings found between the bed and the nightstand on Inez's side of the bed were also determined to have been fired from the recovered gun.

The evidence shows this gun was owned by Vincik. Vincik testified he kept a loaded .45 in a drawer in the bedroom. He also testified he kept the gun's gunbox downstairs. The serial number on the gunbox discovered by Officer Hagist on the desk in the basement matched the serial number on the gun found on the bed. When this was brought to Vincik's attention at trial, he acknowledged the recovered gun was "probably" his. Moreover, an atomic absorbtion test performed on Vincik's hands revealed significant levels of antimony and barium, indicating he may have fired a weapon or been in the immediate area of a discharging weapon. Inez's hands did not register significant levels of these substances.

Vincik himself sustained one gunshot wound to the head from a slug fired from a distance of less than six inches. The slug entered at Vincik's right temple and exited just below his left temple. A bullet hole was observed in the wall, to the right of

the bed. The third .45 shell casing, found under the bed, was also determined to have been fired from the recovered gun.

The foregoing evidence, in conjunction with the evidence of Vincik's financial troubles, is sufficient to convince a rational fact finder beyond a reasonable doubt that Vincik murdered his wife and then attempted to commit suicide. We therefore affirm Vincik's conviction.

AFFIRMED.