# IN THE COURT OF APPEALS OF IOWA

No. 22-1169
Filed July 24, 2024

**STATE OF IOWA,**
      Plaintiff-Appellee,

**vs.**

**EMMANUEL ZLEH TOTAYE, JR.,**
      Defendant-Appellant.
_____

      Appeal from the Iowa District Court for Polk County, Celene Gogerty, Judge.

      A criminal defendant appeals his convictions for three counts of second-degree murder and three counts of first-degree robbery. **AFFIRMED.**

      Alfredo Parrish, Benjamin D. Bergmann, and Alexander Smith of Parrish Kruidenier, L.L.P., Des Moines, for appellant.

      Brenna Bird, Attorney General, and Kyle Hanson (until withdrawal) and Genevieve Reinkoester, Assistant Attorneys General, for appellee.

      Heard by Ahlers, P.J., and Chicchelly and Buller, JJ.

**BULLER, Judge.**

Following a dispute over forty dollars, one trio of teenage boys robbed, shot, and killed another trio of teenage boys on the south side of Des Moines. The first trio ransacked a house, stuffed the victims' bodies into a closet, and fled the scene. An intensive police investigation followed: forensics linked one of the murder weapons to a shooting the next day, stolen loot turned up in a co-defendant's possession shortly after that, and one of the offenders later cooperated with the prosecution. A jury heard this and other corroborating evidence before convicting Emmanuel Totaye of three counts of second-degree murder and three counts of first-degree robbery. Totaye appeals, alleging multiple errors across this three-week trial. Finding no reversible error before us, we affirm.

## I. Background Facts and Proceedings[1]

Vinson Swanks and the mother of his children had dinner together before Vinson returned alone to their shared duplex and discovered "everything was flung around" inside. Based on this disarray, Vinson suspected his teenage sons had a fight, so he video-called the boys' mother. The two were on the video-call when Vinson discovered their sons (D. and M. Swanks) and one of the boys' friends (T.W.) dead in the closet of an upstairs bedroom. Horrified, Vinson "freaked out" and "jetted" outside, fearing the murderer was still in the home. Vinson ended the video call and he and the boys' mother separately called 911 around 11:00 p.m.

Police arrived within minutes, entered the house, and found the boys' bodies with no signs of life. Officers observed blood and brain matter on the

---

[1] We use initials for the minor victims and first names for witnesses who share surnames.

corpses, which were "stacked" on top of each other among clothes and other debris in the closet. Crime scene investigators recovered spent .380 caliber casings and shotgun shells, as well as a pillow that appeared to have been shot through at close range. From the condition of the bodies, it was evident the wounds included both "shotgun blasts" and small-arms fire from a handgun.

**The day of the triple-homicide, as told by an accomplice**

Leontreal "Trel" Jones fled the state shortly after the murders made the news. After Jones was on the lam for about six months, law enforcement found him in Illinois. Jones agreed to cooperate and, as part of a proffer agreement, informed police how he, Totaye (known to Jones as "Dutch"), and Daishawn "Dai Dai" Gills perpetrated the robberies. Jones also told police that Totaye and Gills killed the victims.

Jones told the jury he was spending time with Gills on the day of the murders when Gills brought up perpetrating a "stain," meaning a robbery. The two then met up with Totaye and drove Gills's dark-colored Chevy Malibu to the Swanks home, where D. Swanks, M. Swanks, and T.W. were hanging out. There, the group talked with D. Swanks about "doing a stain." The agreed-upon target—"some white guy in a fanny pack"—was located in apartments behind a local mall, and Jones, Gills, and the Swanks brothers went there in Gills's Malibu. But the target never showed. Later that day, the group attempted to sell a video-game console at GameStop, and Jones and D. Swanks went into the store. But they couldn't make the sale because they were missing a cord.

According to Jones, Totaye gave M. Swanks $100 cash during the afternoon's events, so M. Swanks could take a photo of the money to prove they

could afford to buy drugs. But apparently M. Swanks did not return all $100 of Totaye's cash—allegedly shorting him $40.

When the group later returned to the duplex, the Swanks brothers went inside first. Still in the car, Gills and Totaye discussed robbing the brothers while Jones listened; Jones claimed to not want any part of the robbery but didn't say anything to stop it. Gills and Totaye then went into the house: one armed with a .380 handgun and the other with a shotgun. Jones followed them about twenty minutes later "because they were taking too long."

Inside, Jones observed the home was "flipped"—torn apart—with bags of loot, including a black Jordan backpack, near the door. He found Gills, Totaye, the Swanks brothers, and T.W. upstairs: the brothers and T.W. were putting their cell phones into a bag at Totaye and Gills's direction. Gills then said, "they got to go," which Jones understood to mean "somebody going to die." According to Jones, he and Totaye verbally disagreed with killing the Swanks brothers and T.W., but Gills ordered the three victims into a bedroom closet. Jones then left the house. The last thing Jones saw inside was the Swanks brothers and T.W. herded into the closet, and the last thing he heard was gunfire.

Soon after, Gills and Totaye returned to Gills's Malibu with the .380 handgun, the shotgun, and bags containing proceeds from the robberies. At this point, Jones heard Totaye say he "heard somebody still breathing," and Gills retrieved the shotgun and went back into the house. When Gills came back outside, he remarked "the gun had no kickback to it" and that he either "saw the brains" or "shot the brains." According to Jones, he, Totaye, and Gills then went to Totaye's house with the stolen property, where they "split everything up" and

"smoked a blunt." Jones's share of the loot was "some weed," some gaming devices, and some cellular phones. Jones did not identify how the trio divvied up the rest of the loot, but he knew they took a black Jordan backpack.

**A shooting and surveillance the next day**

Following investigation of the crime scene at the duplex, police surveilled Totaye's residence. During the stakeout, officers observed Gills stop by Totaye's residence, still driving his Malibu. After Gills left, police saw Totaye leave in another car. Police stopped the car and arrested Totaye. While impounding Totaye's vehicle, officers received reports of a drive-by shooting involving a Malibu at an intersection along Evergreen Avenue.

The reporting motorist was driving with his wife and three-month-old baby when a noise startled him: a gunshot shattered his rear window, and a bullet pierced the passenger-side sun visor. The motorist took photos of a car involved in the shooting, including its license plate. Police confirmed this car was Gills's Malibu, and investigators recovered spent .380 caliber casings from the site of the shooting. The bullet that hit the vehicle with the baby was stuck in the visor and couldn't be removed.

Following this shooting, police continued to surveil Gills and observed him and his girlfriend get into a rideshare van carrying two cardboard boxes of unknown items. Officers stopped the van, took Gills and his girlfriend to the police station, and seized those boxes along with a purse containing two full quart-sized bottles of lighter fluid. The boxes contained a PlayStation gaming console and controller, cell phones, a towel, a black Jordan backpack, boxing gloves, a receipt made out to Gills for the Malibu, and a spent .380 caliber casing. Later investigation and

interviews with the surviving members of the Swanks family confirmed the backpack, PlayStation console and controller, and boxing gloves were all from the Swanks home. A unique identifying number also confirmed one of the cell phones in Gills's box belonged to D. Swanks.

The same evening, police executed a search warrant at Totaye's house. Officers found a white Xbox later confirmed as the Xbox the Swanks brothers had received from their mother at Christmas.

**Police interviews**

Police interviewed Totaye and Gills at the stationhouse. Totaye was generally uncooperative, denied knowing the Swanks brothers, Gills, or Jones, and claimed to not know where the stolen Xbox found in his house came from. Meanwhile, Gills acknowledged the Malibu was his car but denied involvement in any violent criminal activity and insisted he was taking the cardboard boxes to his "auntie's"—though he couldn't say where she lived. When a detective asked why his girlfriend had lighter fluid, Gills said it was for a "barbecue." He also denied obtaining the boxing gloves or any other property in the boxes from the Swanks home. Gills's girlfriend told police and later the jury that Gills directed her to get and bring the lighter fluid.

The Swanks brothers' mother provided police with a receipt and serial number showing the Xbox found in Totaye's residence was the one she gave the boys for Christmas. She also positively identified the boxing gloves, black Jordan backpack, and Xbox controllers as property stolen from the Swanks residence.

D. Swanks's girlfriend and T.W.'s girlfriend both corroborated aspects of Jones's account. D. Swanks's girlfriend saw Gills, Jones, Totaye, and the brothers

together at the duplex earlier in the day. That same day, she also saw Gills with a long gun tucked in his clothes. T.W.'s girlfriend gave police screenshots of messages between her and T.W., one of which specified he was "finna" (about to) "go hit a stain," and another later said "if I get shot just know I really did like you." The next day at school, T.W.'s girlfriend learned he had been murdered when she heard the announcement over the high school intercom.

Other witnesses, including a GameStop employee, a neighbor, and the victims' family members, further corroborated Jones's timeline. The GameStop employee recalled that Jones and D. Swanks came into the store the day of the murders and the employee verified a recorded video from that day. The woman who shared a wall with the Swanks heard a "bang-bang" noise—at least two sets of three shots—starting around 8:15 p.m. T.W.'s mother described how a location-tracking application sent her a message that T.W.'s phone disconnected from the application—a message she had never received before—at 8:31 p.m. And she and her daughters knocked on the door at 9:00 p.m. and again a bit later, with no answer.

**Forensics—firearms and autopsies**

Police established a tentative link between the .380 casings recovered from the Swanks home, the shooting on Evergreen the day after, and the casing recovered from Gills's cardboard box. Testing by a Division of Criminal Investigation (DCI) firearms expert at the State Crime Lab ultimately confirmed all but one of the .380 casings from the Evergreen shooting, the murders, and Gills's cardboard box were fired by the same weapon. The one .380 casing that could

not be positively matched was inconclusive—meaning it was possible it was or was not fired by the same weapon.

The county medical examiner performed autopsies on the three victims. The medical examiner determined D. Swanks was shot twice with a shotgun in the back at close-range—"within the order of several feet"—and once in the chest with a handgun. M. Swanks was shot once with a shotgun discharge to the head and twice with a handgun—once in the head and once in the abdomen. As a police officer put it bluntly, it appeared as if the shotgun had been placed in M. Swanks's mouth and fired. T.W. was shot multiple times with the handgun—in the head, face, arm, and shoulder—and once with a shotgun discharge to the back of the head. Gunshot wounds were the cause of death for all three boys, and the manners of death were ruled homicide. Projectiles recovered from the bodies were consistent with .380 caliber ammunition, and recovered shell components were consistent with a twelve-gauge shotgun.

### Digital evidence

Police collected surveillance footage that placed Gills's Malibu outside GameStop and D. Swanks and Jones inside the store. Other video evidence showed a car matching Gills's Malibu approaching the duplex at 7:47 p.m. that evening. Officers also captured footage of Gills's Malibu at Totaye's house before and after the estimated time of the murders.

Social-media evidence generally corroborated the timeline, including messages between Jones, the victims, and their girlfriends. And a location-tracking application recorded that D. Swanks (or at least his cell phone) went to GameStop during the established timeframe and returned home at 7:44 p.m.

**The charges, deliberation, and verdict**

The Polk County Attorney charged Totaye and Gills jointly with three counts of first-degree murder, class "A" felonies in violation of Iowa Code sections 707.1 and 707.2 (2020) with a weapons enhancement under section 902.7, and three counts of robbery in the first degree, class "B" felonies in violation of Iowa Code sections 711.1 and 711.2, also with a weapons enhancement under section 902.7. Following significant pretrial motion practice, Totaye and Gills were tried jointly.

During deliberations, the jury sent multiple notes to the court. One note asked: "If the defendant is deemed guilty of 1st degree Robbery are they also then automatically guilty of 1st degree Murder?" Following the parties' recommendations, the court informed the jury they had "received all the applicable law and should re-read their instructions." The next day, the jury sent a note expressing difficulty coming to a unanimous decision on one of the defendants. The court—again following the parties' recommendations—directed the jury to continue deliberating and "try to reach a unanimous verdict with regard to both defendants." Ultimately, the jury found Gills guilty as charged and Totaye guilty of three counts of second-degree murder and three counts of first-degree robbery.

After reading the verdict, the district court polled the jury at Totaye's request and discharged the jurors. Totaye's attorney then made a remark about the "inconsistency of the verdict" but did not ask for any corrective action.

Totaye later moved for a new trial, and the district court denied the motion. The court sentenced Totaye to consecutive terms of fifty years in prison with a mandatory minimum of thirty-five years on each count of second-degree murder, class "B" felonies in violation of Iowa Code sections 707.1 and 707.3, with a

weapons enhancement under section 902.7, but ordered the first-degree robbery counts be served concurrently. Totaye appeals.

## II.    Discussion

Totaye raises five legal issues, some of which involve embedded disputes concerning error preservation and the applicable standard of review. We address each claim in turn, tackling one lingering error-preservation question left open in our unpublished cases but leaving a second for another day.

### A. Character Evidence

Totaye first assigns error to the district court's exclusion of additional evidence about Jones's character—what Totaye characterizes as Jones's "violent history, including that he engages in fights and that he takes videos of fights and posts them to social media." Totaye argues the district court should have admitted this evidence under Iowa Rule of Evidence 5.404 and that the State otherwise opened the door by offering evidence Jones did not participate directly in the murders and that an officer was concerned for Jones while he was on the lam. The State counters that evidence of Jones's violent behavior was improper propensity evidence and the door to this evidence remained shut. In our review, we reverse an evidentiary ruling on character evidence "only when we find a clear abuse of discretion." *State v. Casady*, 491 N.W.2d 782, 785 (Iowa 1992).

In making an offer of proof, Totaye cited Jones's deposition as the basis for evidence Jones was placed at an alternative high school because he got into "a lot of fights" at his previous school. Totaye's counsel stressed that, while Jones denied he participated in the murders, this evidence showed "he is that type of person" to commit acts of violence. Defense counsel also argued below that Jones

had been a violent criminal in his past: "He was before; he is now." Consistent with these claims, Totaye argues in the appellate briefing the evidence was offered to "show that Jones . . . had a violent past and [was] more likely to have fired the shots into the victims," and that "[e]vidence of Jones's violent character made it more likely he pulled the trigger as opposed to Totaye."

"Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Iowa R. Evid. 5.404(a)(1). This is a rule of exclusion, barring "propensity evidence" unless an exception applies. *State v. Thoren*, 970 N.W.2d 611, 625–26 (Iowa 2022). In ruling, the district court noted Jones was a witness (not a victim or defendant) and thus evidence of his character was governed by Rule 5.404(a)(3), which only allows admission of character evidence under Rules 5.607, 5.608, or 5.609. In other words, because Jones was a witness, only evidence speaking to his credibility and truthfulness could be admitted. And because Totaye did not articulate either of these non-propensity purposes for admitting evidence of Jones's violent past, the district court excluded the evidence.

We discern no abuse of discretion in that ruling. Using evidence that Jones was violent in the past to prove he was more likely to have been violent on the night of the murders is textbook propensity reasoning:

> In limiting admissibility of character evidence when offered to prove conduct in conformity therewith, Iowa Rule 5.404(a) represents a long-held view that while character evidence may be relevant to conduct, its unfair prejudicial impact generally outweighs whatever probative force it might have. Thus, Rule 5.404(a) states the premise that evidence of character or traits of character are not admissible as circumstantial proof that there was conduct on a particular occasion in conformity with the character trait.

7 Laurie Kratky Doré, *Iowa Practice Series: Evidence* § 5.404:1 (Oct. 2023 update) (footnotes omitted) [hereinafter Doré, *Evidence*].  We also agree with the district court's reading of Rule 5.404(a)(3)'s limitations on the character evidence of witnesses (contrasted with victims and defendants)—as does the leading Iowa evidence treatise.  *See id.* § 5.404:5 ("Rules 5.607, 5.608 and 5.609 limit character evidence about a witness to the trait of truthfulness or untruthfulness.").  The district court was right to exclude evidence of Jones's propensity for violence because such evidence is not admissible to show conduct in conformity—which was Totaye's stated purpose for offering it.  *See State v. Buelow*, 951 N.W.2d 879, 887 (Iowa 2020) ("[Q]uarrelsome, violent, aggressive or turbulent character is character evidence." (internal quotation marks and citation omitted)).

Looking beyond Iowa case law, Totaye points in part to federal precedent: *United States v. Lattner*, 385 F.3d 947, 957 (6th Cir. 2004).  But we find *Lattner* unpersuasive for a few reasons.  First, the federal courts treat their Rule 404 as one of "inclusion," while our supreme court has expressly held Iowa's Rule 5.404 is a rule of "exclusion."  *Compare Lattner*, 385 F.3d at 956, *with Thoren*, 970 N.W.2d at 625.  Second, the evidence at issue in *Lattner* was offered evidence against the defendant under Rule 404(b), while here Jones was only a witness governed by Rules 5.607, 5.608, and 5.609.  *See* 385 F.3d at 957.  And third, *Lattner* turned in part on specific intent and the need for proof by circumstantial evidence to establish mens rea, while here Totaye admits he offered the evidence to prove conduct in conformity therewith concerning actus reus—in his words, to prove that Jones's violent history "made it more likely he pulled the trigger as opposed to Totaye."  *Cf. id.* (discussing intent evidence).

Last, Totaye invokes the doctrine of curative admissibility, arguing the State "opened the door" to evidence of Jones's violent character. Assuming without deciding error was preserved on this argument, we conclude the doctrine does not apply. "The doctrine of curative admissibility . . . only applies when inadmissible evidence has been entered into the record and the other party seeks to admit further inadmissible evidence to cure the error." *State v. Huser*, 894 N.W.2d 472, 506–07 (Iowa 2017). Jones's denial of participating in the murders and an officer's concern for Jones's safety did not trigger the doctrine of curative admissibility. *See id.* Even assuming without deciding these specific acts are "character" evidence, the denial of committing a single violent incident or a third party's concerns about someone's welfare cannot open the door to a person's entire history of violence. If so, every defendant who pleads not guilty to a violent crime would open the door to a play-by-play of every violent incident in their lives— potentially offered by the State for the very propensity purpose this rule of exclusion forbids. *See* Iowa R. Evid. 5.404. Our rules do not countenance opening the floodgates to propensity evidence in this fashion, whether offered by a defendant or the prosecution. *See State v. Sullivan*, 679 N.W.2d 19, 24 (Iowa 2004) (noting "the critical importance of guarding against inroads on the rule, not because bad-acts evidence has no probative value, but for the very reason that such evidence may have very substantial value not recognized in law"). We affirm the district court's handling of character evidence here.

### B. The Stipulation

Totaye's next claim concerns a stipulation he and the State entered into at trial. He argues on appeal that the district court "abandoned its role as a neutral

arbiter and became an advocate for the State" by "forcing [him] into an unfavorable stipulation." The context for the stipulation takes a bit of wind-up to explain, and we'll address the State's challenge to error-preservation (perhaps more accurately conceptualized as waiver) along the way. Because we conclude no constitutional claim was preserved, we review for abuse of discretion on this evidentiary issue. *See State v. Williams*, 929 N.W.2d 621, 628 (Iowa 2019).

Before trial, Totaye moved to exclude evidence of an additional robbery in which Totaye allegedly stole an Xbox from a victim with the surname Williams earlier on the day of the murders. This robbery apparently led to charges in a separate Polk County criminal number. Totaye's pretrial argument was that the Williams robbery "involve[d] entirely separate conduct with an entirely separate alleged victim" and that "[a]ny evidence related to that robbery" should be excluded as irrelevant, prejudicial, improper character evidence, and evidence likely to confuse the jury. The State did not resist Totaye's request, and the district court granted that portion of Totaye's motion and definitively excluded the evidence.

But during opening statements, Totaye's counsel at least implied to the jury that Totaye bought the Swanks brothers' Xbox after failing to sell it at GameStop. After openings, the assistant county attorneys asked to make a record outside the presence of the jury and expressed concern that Totaye was trying to use the court's pretrial ruling as a sword to mislead the jury rather than a shield against other-acts evidence. The prosecutors warned that they may have to seek to admit evidence of the Williams robbery to counter that false impression, but they did not seek relief at that time. When given the opportunity to make a record and explain their assertions during opening statements, Totaye's attorneys declined.

Near the end of trial, Totaye's counsel questioned a police officer about his preliminary-hearing testimony that Totaye was carrying some type of electronic device to his car earlier on the day of the murders. Concerned that the defense had misled the jury into thinking the Swanks brothers' Xbox had to be the same one taken to the car and then to GameStop, the prosecutors again asked to be heard outside the presence of the jury. The prosecutors cited the court's pretrial ruling and the earlier discussion and noted they were not yet seeking relief but were increasingly concerned they would need to admit evidence of the Williams robbery to dispel any misconception about the Xbox. The district court rejected Totaye's claim that the State had opened the door to this evidence and the court voiced its own concern about the pretrial ruling: "I don't want this jury to have a false impression, and I think we're coming dangerously close to that false impression, if we're not already there." The court suggested the parties try to work out a stipulation "that there was a second white Xbox" because the court "d[id]n't want to get into the fact there was this alleged other robbery."

Totaye's counsel first said "I'm happy to stipulate," but then the record devolved into a back-and-forth between prosecutors and the two sets of defense counsel over the particulars. Totaye's counsel reiterated "we'll say again we'll agree to the stipulation." The court eventually interrupted the on-the-record disagreements and suggested everyone take a break to work on the stipulation because the court "assume[d] no one wants to" get into the details of the Williams robbery. Totaye's attorney agreed with the court's assumption.

The parties reached an agreement after a forty-minute break and some on- and off-the-record wrangling over details. Gills's counsel proposed language to

the effect that the Xbox possessed outside Totaye's home "was unrelated to any Xbox owned or possessed by [the] Swanks [brothers]." Totaye's attorney responded, "we would agree to that." Some additional colloquy ensued[2] before the final stipulation language was circulated. When the court asked if the parties agreed to the stipulation, Totaye's attorney said: "I don't think that's bad. I think it's pretty good." The court then read the stipulation to the jury, and Totaye did not object. But the next day, Totaye's counsel moved for a mistrial based largely on the same arguments he now raises. The court denied the motion.

The State maintains that, through this protracted course of events, Totaye repeatedly agreed to the stipulation and cannot change his mind to complain now on appeal. *See State v. Rutledge*, 600 N.W.2d 324, 325 (Iowa 1999) ("Nothing is more basic in the law of appeal and error than the axiom that a party cannot sing a song to us that was not first sung in trial court."). We view the issue somewhat differently and think it is a question of waiver in addition to error-preservation. Along with the failure to object when the court read the stipulation to the jury, we find Totaye's repeated statements agreeing to the stipulation waived or invited any error flowing from it. *See, e.g.*, *State v. Rasmus*, 90 N.W.2d 429, 430 (Iowa 1958) ("A party to a criminal proceeding cannot assume inconsistent positions in the trial and appellate courts and, as a general rule, will not be permitted to allege an error in which he himself acquiesced, or which was committed or invited by him, or was

---

[2] There was also some dialogue about the exact time of the Williams robbery. The record on this question is limited and conflicting. This cluster of ambiguity reinforces how undesirable it was for this case to devolve into a collateral mini-trial over the Williams robbery.

the natural consequence of his own actions." (citation omitted)). Totaye is not entitled to relief on a stipulation he agreed to.

Nor can Totaye's belated challenges to the stipulation, made the morning after it was read to the jury without objection and then later with amplification in his motion for new trial, bolster his error-preservation claim. *See State v. Krogmann*, 804 N.W.2d 518, 523–24 (Iowa 2011) ("The doctrine of error preservation has two components—a substantive component and a timeliness component. . . . [A] motion for new trial is not the appropriate time to raise matters for the first time that could have been raised earlier."); *Sievers v. Iowa Mut. Ins. Co.*, 581 N.W.2d 633, 638 (Iowa 1998) ("On appeal, we consider only those objections to instructions raised in the district court. . . . A party therefore may not amplify or change the grounds on appeal."). This is particularly true for Totaye's post-trial claims, such as his constitutional arguments, that go well beyond the complaints made on the record at trial.

But we elect not to rest our resolution of this issue entirely on error-preservation and waiver grounds. In an abundance of caution, we analyze the merits of the claim Totaye expressed at trial, albeit untimely: whether the district court abused its discretion in encouraging the stipulation as an alternative to admitting evidence of the Williams robbery.

On our review, we discern no abuse of discretion in the district court's navigation of this tricky situation. The court's pretrial ruling was violated—in spirit if not letter—by Totaye's counsel's opening statement and elicitation of facts about the second Xbox during cross-examination. The district court was understandably concerned about the false impression Totaye's counsel was giving the jury, which

was that Totaye and/or his co-defendants came into possession of the Swanks brothers' Xbox by amiable exchange rather than robbery. This was a problem of Totaye's own making. And the court likely could have admitted some evidence of the Williams robbery (perhaps with a limiting instruction) for the non-propensity purpose of clarifying that the Swanks brothers' white Xbox was not the only one possessed by the defendants on the day of the murders. *See* Doré, *Evidence*, § 5.404:6 & n.84 ("Federal circuit courts have ruled that other similar acts may be introduced to show a common scheme or plan when a defendant presents an 'innocent association' defense."). In short, Totaye was not entitled to advocate his innocent possession of the Swanks brothers' Xbox and simultaneously gag the truth and prevent the jury from receiving competing evidence. *See Iowa Nat'l Mut. Ins. Co. v. Worthy*, 447 So. 2d 998, 1000 (Fla. Dist. Ct. App. 1984) ("An order in limine should only be used as a shield and never to gag the truth and permit other evidence to mislead the jury because the limine order prevents such evidence from being rebutted.").

Faced with the prospect of admitting other-crimes evidence, we cannot say it was unreasonable for the district court to encourage the parties to resolve the issue by stipulation. Totaye cites no case finding a court encouraging a stipulation to avoid other-crimes evidence was error, and we are aware of none. And the stipulation was likely a preferable solution for all parties by avoiding the pitfalls of other-crimes evidence for both the State (fearing appellate scrutiny upon successful conviction) and Totaye (fearing trial prejudice from his involvement with other criminal activity). For this reason, we conclude that, even if the court should not have encouraged the stipulation, any error was harmless.

Last, we specifically reject Totaye's assertions the district judge "abandoned [her] role as neutral arbiter" or "forced" him into the stipulation. In a complex multi-week trial, this judge called balls and strikes, navigated numerous complex evidentiary issues, and resolved disagreements between two veteran prosecutors, two experienced public defenders representing Gills, and two seasoned attorneys representing Totaye. While we understand why Totaye is attacking the stipulation after receiving a guilty verdict, litigants cannot manufacture a problem and complain after agreeing to the most palatable of undesirable solutions. *E.g.*, *Rasmus*, 90 N.W.2d at 430 (on invited or acquiesced error); c*f. State v. Iowa Dist. Ct.*, 6 N.W.3d 723, 724 (Iowa 2024) ("Applying the old rule, 'You break it, you buy it' . . . ."); *State v. Vincik*, 436 N.W.2d 350, 354 (Iowa 1989) (recognizing a defendant cannot claim error in admission of evidence he offered). If any error is properly before us, we discern no abuse of discretion in the district court's handling of evidentiary issues surrounding the stipulation, the second Xbox, or the Williams robbery.

### C. Inconsistent Verdicts

Totaye next asserts the jury's second-degree murder verdicts are inconsistent with his convictions for first-degree robbery. In short, he argues he should have been convicted of first-degree murder or acquitted of first-degree robbery. The parties dispute the standard of review: de novo or for correction of errors at law. *But see State v. Sassman*, No. 21-0434, 2022 WL 4361785, at *3 (Iowa Ct. App. Sept. 21, 2022) (referring to a "hybrid standard of review" for these claims that combines the two). We need not resolve the dispute in this case, as we would come to the same conclusion in reviewing this legal question under either

standard because we do not defer to the district court's legal conclusions. *Compare State v. Halstead*, 791 N.W.2d 805, 807 (Iowa 2010) (rejecting the parties' framing of review as for "substantial evidence" and instead reviewing a "question of law" with the caveat "[t]o the extent constitutional issues are raised, review is de novo"), *with State v. Merrett*, 842 N.W.2d 266, 272–73 (Iowa 2014) ("The consequence of a potentially inconsistent jury verdict is a question of law, and accordingly, our review is de novo.").

But even with this standard-of-review dispute set aside, we must tackle a thornier error-preservation debate. In *Halstead*, the State conceded error was preserved on a compound-inconsistent-verdicts claim presented by motion for new trial. 791 N.W.2d at 807 n.1. Since then, our appellate courts have avoided decisively resolving how error should be preserved on inconsistent-verdicts claims when the State contests the issue. *See, e.g.*, *State v. Thiel*, No. 22-1293, 2024 WL 111774, at *8 (Iowa Ct. App. Jan. 10, 2024) (describing this "murky issue" and noting "we've avoided deciding" it); *State v. LuCore*, 989 N.W.2d 209, 219 (Iowa Ct. App. 2023) ("Sidestepping the serious error-preservation concern . . . ."); *Sassman*, 2022 WL 4361785, at *2 ("[W]e opt to bypass the error-preservation issue."); *State v. Doorenbos*, No. 19-1257, 2020 WL 3264408, at *3 (Iowa Ct. App. June 17, 2020) (noting the concession in *Halstead* and "opting to reach the merits"); *State v. Scholtes*, No. 16-1967, 2017 WL 3525296, at *1 (Iowa Ct. App. Aug. 16, 2017) (recognizing the error-preservation issue and citing a civil case to address the merits notwithstanding). The State contests error-preservation here and urges us to resolve the open question and hold that a criminal defendant must

preserve error by timely objecting before the jury is discharged. At oral argument, Totaye's counsel also candidly acknowledged the need for guidance on this issue.

The core of the State's argument is that we should require error preservation when corrective action may still be taken. *See Krogmann*, 804 N.W.2d at 524 ("[O]ur regular error preservation rules also require parties to alert the district court 'to an issue at a time when corrective action can be taken.'" (citation omitted)). The rules of criminal procedure, which authorize the district court to "direct the jury to reconsider" an inconsistent verdict lend support to this view. Iowa R. Crim P. 2.22(6).[3] The State highlights this need for timely corrective action is "doubly important" in criminal cases after *Halstead*, where our supreme court held that inconsistent split verdicts required acquittal on both charges without possibility of retrial given double jeopardy. 791 N.W.2d at 816–17. To conclude otherwise, the State urges, motivates defendants to gamble on their own convictions—avoiding the possibility a jury reconsiders its verdicts and convicts on a greater charge while keeping an ace up the defendant's sleeve in the form of appellate review after jeopardy has attached and retrial on the greater charge may be thwarted.

---

[3] The State relies on the current version of the rule, which went into effect in October 2022. The previous version of the rule contained a similar concept, without specific refence to inconsistent verdicts. *See* Iowa R. Crim. P. 2.22(6) (2021). We assume this change was a clarification rather than expansion of the rule, given the supreme court's citation of existing case law in its non-binding explanatory summary. *See* Iowa Rules of Criminal Procedure Review Task Force, *Summary of Proposed Changes to the Iowa Criminal Rules of Procedure*, Iowa Judicial Branch: Orders (Mar. 30, 2020), https://perma.cc/KZL6-8SHA.

Totaye urges the State's prior concession in *Halstead* ought to control. But concessions in other cases are not binding in this one. Totaye also notes that in civil cases a motion for new trial preserves error on inconsistent verdicts. *See Bryant v. Parr*, 872 N.W.2d 366, 376 (Iowa 2015). But considering the double-jeopardy concerns in criminal cases following *Halstead*, we are not persuaded civil precedent offers much guidance. Totaye also points to two unpublished cases where we reached the merits of an inconsistent-verdicts claim; but in both those cases, we bypassed error-preservation concerns rather than rule on them. *See Sassman*, 2022 WL 4361785, at *2; *State v. Komeh*, No. 19-0477, 2020 WL 5944218, at *2–3 (Iowa Ct. App. Oct. 7, 2020). We doubt our past choices to affirm on a path of least resistance clears up the question here.

The need to rule on the error-preservation question is also more compelling on this record, where there is affirmative evidence Totaye's counsel recognized the inconsistent-verdicts issue while corrective action could be taken and knowingly chose to not seek relief—he made the very gamble the State cites as a policy concern. "Accepting such a waiver from a defendant is not so different from accepting a defendant's guilty plea refusing to admit commission of a criminal act, but recognizing the record contains strong evidence of actual guilt." *State v. Merrett*, No. 12-1336, 2013 WL 3855692, at *12 (Iowa Ct. App. July 24, 2013) (Tabor, J., dissenting) (analyzing record where the district court notified the parties of potential inconsistency in a verdict but the parties declined to have the jury reconsider), *vacated on other grounds*, 842 N.W.2d 266. After the jury returned its verdict here and had been polled at Totaye's request, the court asked Totaye's counsel whether he wished to make any record. He responded: "Your Honor, not

at the moment, but I think the inconsistency of the verdict, we'll address at some point." Totaye did not ask that the jury reconsider its verdict, and the jury was subsequently discharged.

It's perhaps understandable why Totaye's counsel did not wish the jury to reconsider its verdict and resolve the alleged inconsistency: the jury might have returned guilty verdicts on first-degree murder with its attendant punishment of life without parole. But fundamental principles of fairness do not allow Totaye to knowingly accept the allegedly inconsistent verdicts when it suits his interest then complain down the road after jeopardy has attached and retrial on the top charge may be thwarted. *See United States v. Powell*, 469 U.S. 57, 65 (1984) (recognizing that uncertainty over "whose ox has been gored" leads most courts to overlook inconsistent verdicts in part because "the Government is precluded from challenging the acquittal"). We hold that, to pursue an inconsistent-verdicts claim on appeal, a criminal defendant must timely raise the objection before the district court discharges the jury, such that the jury is able to reconsider the verdict as contemplated by Iowa Rule of Criminal Procedure 2.22(6) or the trial court may grant a new trial before jeopardy precludes it. *See State v. Mumford*, 338 N.W.2d 366, 371 (Iowa 1983) (approving of these two options).

That said, we recognize Totaye could feel surprised by us resolving this open error-preservation question adversely to him given our unpublished cases. So we explore the merits of his claim as if preserved. *Cf. State v. Harrington*, 893 N.W.2d 36, 43 (Iowa 2017). In doing so, we must evaluate "whether the verdict is so logically and legally inconsistent as to be irreconcilable within the context of the case." *Merrett*, 842 N.W.2d at 275–76 (quoting *State v. Fintel*, 689 N.W.2d 95, 101

(Iowa 2004)). And we liberally construe the verdicts to "give effect to the intention of the jury and to harmonize the verdicts if it is possible to do so." *State v. Goodon*, No. 19-0174, 2020 WL 2060301, at *3 (Iowa Ct. App. Apr. 29, 2020).

The gist of Totaye's claim is that the jury could not have acquitted him of first-degree murder while convicting him of first-degree robbery because the felony-murder alternative was marshaled to require the jury find Totaye "was committing the crime of robbery in the first degree when the killing occurred." In essence, he argues that a conviction on first-degree robbery required conviction on first-degree murder. The State focuses on the marshaling instruction's wording, noting the jury could have concluded Totaye committed the robbery and killed the Swanks brothers and T.W. but wasn't "committing the crime of robbery in the first degree *when the killing occurred*." Thus, according to the State, perhaps the jury found the robbery was over before the killings.

We find this distinction offers adequate explanation for the jury acting logically and legally consistently given the unique phrasing of the marshaling instruction. *See Merrett*, 842 N.W.2d at 275 (coming to a similar conclusion because "[t]he instructions as given became the law of the case"). And we see significant daylight between the alleged inconsistency on separate counts here and the compound-inconsistency in *Halstead*, where the jury both convicted on a greater offense and acquitted on the predicate. *See* 791 N.W.2d at 814–15.

And while we think this review should be confined to the law rather than the facts, we see facts in the record logically supporting the jury's distinction. According to Jones, Totaye was not an eager participant in the murders, and it was Gills rather than Totaye who went back inside with the shotgun after taking loot to

the car, presumably to finish the job because at least one victim was still breathing. Although significant evidence supported conviction for first-degree murder, the jury could have found Totaye committed murder in the second degree through a literal reading of the marshaling instructions. We conclude Totaye is owed no relief on the merits even if he had preserved his claim.

### D. Prosecutorial Error

Totaye next alleges prosecutorial error in the assistant county attorney's rebuttal closing argument. "Trial courts have broad discretion in ruling on claims of prosecutorial misconduct and we review such rulings for an abuse of discretion." *State v. Plain*, 898 N.W.2d 801, 810 (Iowa 2017) (citation omitted). And to prevail, Totaye must show both prosecutorial error and that such error resulted in prejudice that denied him a fair trial. *State v. Coleman*, 907 N.W.2d 124, 138 (Iowa 2018).

The first statement Totaye challenges concerns the credibility of witnesses. In response to a defense argument regarding Jones's credibility, the prosecutor said: "[L]et's talk a little about the defendants' interviews because they were very critical of Mr. Jones and his lack of candor, his demeanor. . . . I would put Mr. Jones's demeanor up against either one of these defendants in their interviews any day of the week." Totaye argues this statement vouched for Jones. He also claims the sentences that followed were vouching and error or misconduct: "So Mr. Totaye's counsel takes offense because he was interrupted [seventy-nine] times. Well, you heard it. You can hear it again, if you want to. The police were tired of being lied to, and they told him that."

"A prosecutor 'is entitled to some latitude during closing argument in analyzing the evidence admitted in the trial.'" *State v. Graves*, 668

N.W.2d 860, 874 (Iowa 2003) (citation omitted). But a prosecutor may not express personal beliefs or personally vouch for the credibility of a State's witness. *Id.* Our precedent also recognizes that, as part of the adversarial process, the prosecution may respond in-kind to defense arguments:

> A prosecutor is not required to sit mute and let the defendant's interpretation of evidence go unchallenged. A prosecutor is entitled to make a fair response, or "invited and fair comment," on a new argument defendant presents during closing. The prosecutor is allowed this additional leeway because it was the defendant's own new argument that prompted the prosecutor's response.

*State v. Thornton*, 498 N.W.2d 670, 676–77 (Iowa 1993) (citations omitted).

The first comment, about putting a State's witness "up against" the defendants' interviews, was an argument to the jury about weighing the credibility of witnesses to resolve conflicts in the evidence, as required by the jury instructions and inherent in nearly every trial. We have expressly recognized "[t]he credibility of witnesses is a proper subject for discussion during closing argument." *State v. Martens*, 521 N.W.2d 768, 772 (Iowa Ct. App. 1994). And the comments made here do not veer into personal vouching. *See State v. Williams*, 334 N.W.2d 742, 745 (Iowa 1983) ("The governing principle [precluding vouching] does not preclude all personalized remarks; it merely precludes those that do not appear to be based on the evidence."); *State v. Escobedo*, 573 N.W.2d 271, 278 (Iowa Ct. App. 1997) ("The use of the personal pronoun 'I' by a prosecutor during closing argument does not generally amount to an improper expression of personal belief as long as it clearly communicates nothing more than a comment on the evidence."). We also recognize Totaye's counsel invited these comments to one extent or another with argument about Jones's credibility—stressing to jurors, "You

saw his demeanor. Right? You saw how this guy acts. Forget all that other stuff"—and exclaiming, "Are you kidding me? You [the jury] should all be offended that they [the State] would march someone like that [Jones] in here and try to say that's proof beyond a reasonable doubt." Neither the State nor defense closing arguments included perfect language (few extemporaneous remarks do), but our review of the record convinces us the prosecutor did not cross the fine line into impermissible argument. *See Williams*, 334 N.W.2d at 745 ("Viewed in context, all of the prosecutor's challenged remarks were obviously based on his view of the evidence.").

On the second comment, the State urges we should resolve the claim by finding Totaye lied (thus insulating the prosecutor's comment from a *Graves* analysis) or conclude Totaye invited error. We approach the issue slightly differently and elect to resolve the issue in a way that does not turn on Totaye's statements. The statement "[t]he police were tired of being lied to, and they told them that" appears to be an accurate summation of evidence presented to the jury. In the recorded interview played at trial, the officer described himself as "frustrated" and told Totaye his evasion and dishonesty "makes it seem like you're lying, like a liar." In cross-examination by Totaye's counsel, the officer agreed with Totaye's counsel that "you guys [(Totaye and the officer)] showed a little bit of frustration with each other" and "it's pretty apparent from the video." In viewing the video, we independently draw the same conclusion about the officer's frustration based on his demeanor and tone. We generally disapprove of any lawyer using the words "lied" or "liar" in closing argument given *Graves* and the danger an attorney may inadvertently cross the fine line into professional misconduct. *See* Iowa R. Prof'l

Cond. 32:3.4(e) (prohibiting all lawyers from "stat[ing] a personal opinion as to . . . the credibility of a witness" during trial). But we find no prosecutorial error here given the context of the rebuttal comments and the facts developed at trial. While perhaps inartful, the prosecutor was entitled to rely on the explanation given by police and developed by Totaye's counsel for why the interview grew hostile.

We last consider whether, if the prosecutor's statements had crossed into error, Totaye suffered any prejudice—the ultimate question being whether Totaye was denied a fair trial. *See Graves*, 668 N.W.2d at 869. The analysis focuses on the severity and pervasiveness of the error, the significance of the error to the central issues in the case, the strength of the State's evidence, the use of any cautionary measures, and the extent to which the defense invited the error. *Id.* We agree with the district court that Totaye was not prejudiced under these factors based in part on the isolated nature of the comments and that the comments were responsive to Totaye's closing argument. We also think the circumstantial evidence in this case was relatively strong. And because Totaye expressly contends "there were no cautionary instructions" as part of this prejudice analysis, we single that factor out for a little more discussion.

Totaye's counsel did not raise this issue until he moved for a mistrial after the jury had been sent home for the day—following closing arguments but before the jury began formally deliberating. Neither party requested a curative instruction, and we do not fault the court for not issuing a spontaneous targeted curative instruction when there was no contemporaneous objection. Still, the court did give a standard cautionary instruction reminding jurors that the arguments of attorneys

are not evidence. And there is no reason to think a more targeted curative instruction would have moved the needle, given the lack of prejudice.

On the broader error-preservation question begged by the lack of contemporaneous objection, we recognize that in *civil* cases objections to attorneys' closing argument can be made immediately following closing argument but before submission to the jury, outside the presence of the jury, and still preserve error. *See Kinseth v. Weil-McLain*, 913 N.W.2d 55, 67 (Iowa 2018). But we decline to speculate on whether, in a case where this issue was fully briefed (unlike here), we would apply the same rule to criminal cases. *See State v. Waite*, No. 19-1560, 2021 WL 2453373, at *2 n.5 (Iowa Ct. App. June 16, 2021) (declining to impose a different standard for civil rather than criminal cases in this context, without evaluating differences between the two). And we note competing criminal precedent from the supreme court. *Compare State v. Nelson*, 234 N.W.2d 368, 371 (Iowa 1975) ("[O]bjections to remarks of counsel during final jury argument are timely if urged at close of argument and in a motion for mistrial made before submission to the jury."), *with State v. Whitfield*, 212 N.W.2d 402, 406 (Iowa 1973) ("Defendant had the duty to object at the time of argument to offensive or improper remarks made by the county attorney in his closing arguments, and unless such objection was made he waived his right to complain of such offensive or improper remarks in a motion for new trial or on appeal here."). For purposes of this appeal, we assume without deciding error was preserved on the prosecutorial-error claim, and we affirm on the merits.

### E. Weight of the Evidence

Totaye last contends the district court applied the wrong legal standard in its oral new-trial ruling evaluating the weight of the evidence, which in pertinent part reads:

> With regard to allegations that the verdicts were contrary to the weight of the evidence, a verdict that is contrary to the weight of the evidence has grounds for a new trial only when a greater amount of credible evidence supports one side of the issue or cause [than] another . . . . Standard views when ruling on a motion for a new trial on a ground that the verdict was contrary to evidence is more stringent than insufficiency and that allows the Court only if the evidence supports the alternative verdict as opposed to the verdict rendered.
> . . . .
> I believe that Mr. Jones's testimony was sufficiently corroborated, and I don't believe there's more evidence that supports an alternative verdict than the verdicts as rendered by the jury.

Totaye specifically claims error in the court's reference to a "more stringent" standard. The problem with this claim is that the district court was quoting our supreme court. *See, e.g.*, *State v. Ary*, 877 N.W.2d 686, 706 (Iowa 2016) ("[The weight-of-the-evidence standard] is also more stringent than the sufficiency-of-the-evidence standard in that it allows the court to grant a motion for new trial only if more evidence supports the alternative verdict as opposed to the verdict rendered."). And Totaye's own motion cited *Ary* and one of this court's published cases including the "more stringent" language. *See State v. Linderman*, 958 N.W.2d 211, 223 (Iowa Ct. App. 2021). We see no abuse of discretion in the new-trial ruling.

**III.    Disposition**

Having considered all of the issues raised in Totaye's brief on appeal, and resolving some error-preservation and waiver issues along the way, we affirm his convictions for second-degree murder and first-degree robbery.

**AFFIRMED.**